# United States Court of Appeals for the Federal Circuit

---

**BETH F. COBERT, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT,**
*Petitioner*

**v.**

**MARY A. MILLER, MERIT SYSTEMS PROTECTION BOARD,**
*Respondents*

---

2014-3101

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-11-0766-R-2.

---

Decided: September 2, 2015

---

REGINALD T. BLADES, JR., Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for petitioner. Also represented by STUART F. DELERY, ROBERT E. KIRSCHMAN, JR., TARA K. HOGAN; KAMALA VASAGAM, ROBERT JAMES GIROUARD, STEVEN E. ABOW, Office of General Counsel, Office of Personnel Management, Washington, DC.

EDWARD H. PASSMAN, Passman & Kaplan, PC, Washington, DC, argued for respondent Mary A. Miller.

JEFFREY GAUGER, Office of the General Counsel, Merit Systems Protection Board, Washington, DC, argued for respondent Merit Systems Protection Board. Also represented by BRYAN G. POLISUK.

STEFAN P. SUTICH, National Federation of Federal Employees, Washington, DC, for amicus curiae National Federation of Federal Employees.

HAMPTON H. STENNIS, American Federation of Government Employees, Washington, DC, for amicus curiae American Federation of Government Employees.

--------------------

Before PROST, *Chief Judge,* SCHALL and WALLACH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* SCHALL.

Concurring opinion filed by *Circuit Judge* WALLACH.

SCHALL, *Circuit Judge*.

This appeal arises out of the action of the Department of the Interior, National Park Service ("agency"), that removed Mary A. Miller from her position as Park Superintendent of the Sitka National Historical Park ("SNHP" or "Park") in Sitka, Alaska. Ms. Miller was removed from her position after she refused a management-directed reassignment to a different position at the same grade and pay in Anchorage, Alaska. Ms. Miller appealed her removal to the Merit Systems Protection Board ("MSPB" or "Board"). Following a hearing, the administrative judge ("AJ") to whom the appeal was assigned issued an initial decision sustaining the removal action. *Miller v. Dep't of the Interior*, No. SF-0752-11-0766-I-1, 2012 WL 359828 (M.S.P.B. Jan. 6, 2012) ("*Initial Decision*"). On May 13, 2013, however, the Board issued a decision in which it vacated the *Initial Decision*, reversed Ms. Miller's removal, and ordered the agency to reinstate Ms. Miller to

her position as Park Superintendent. 119 M.S.P.R. 438 (2013) ("*Miller I*"). Subsequently, in a reconsideration decision dated December 6, 2013, the Board affirmed, as modified, its May 13 decision. 120 M.S.P.R. 426 (2013) ("*Miller II*").

Pursuant to 5 U.S.C. § 7703(d), the Director of the Office of Personnel Management ("OPM") petitioned for review of the Board's decision.[1] In an order dated April 23, 2014, we granted the petition. *Archuleta v. Miller*, 562 F. App'x 978 (Fed. Cir. 2014) (unpublished). We now reverse the Board's decision. The case is remanded to the Board, which is instructed to instate the *Initial Decision* as the final decision of the Board.

BACKGROUND

I.

Ms. Miller began her career with the agency in March of 2008. At that time, she was appointed Park Superintendent, GS-13, for SNHP. *Initial Decision* at 2. As Park Superintendent, Ms. Miller oversaw all operations at the Park, including supervising employees and managing a $2.5 million budget. Joint Appendix ("J.A.") 84.

On April 27, 2010, Ms. Miller met with Victor Knox, the agency's Deputy Regional Director and her immediate supervisor. At the meeting, they discussed the newly-created GS-13 position of Alaska Native Affairs Liaison in Anchorage, Alaska.[2] After explaining the significance of

---

[1] OPM may petition this court for review of a Board decision when it believes that "the Board erred in interpreting a civil service law, rule, or regulation" and that the Board's decision will have a "substantial impact" on the administration of the civil service. 5 U.S.C. § 7703(d).

[2] The Alaska Native Affairs Liaison serves as the principal point of contact and the consultation lead for the

the position and stating that "she was the right person for the job," Mr. Knox offered Ms. Miller the liaison position as a voluntary reassignment. *Id.* 207 at 27:21–29:18. During a second meeting later that day, Ms. Miller responded to Mr. Knox's offer. She stated that, for family, health, and financial reasons, she could not accept the reassignment. *Id.* 267 at 266:2–267:19. Mr. Knox then presented Ms. Miller with a memorandum ordering her reassignment to the liaison position. *Id.* 267 at 268:20–269:3. In his memorandum, Mr. Knox set forth the reasons why he believed Ms. Miller to be "qualified and uniquely positioned" for the liaison role, and he gave her ten calendar days to consider the reassignment. *Id.* 94–95. Mr. Knox informed Ms. Miller that "removal procedures" would be taken if the management-directed reassignment was not accepted. *Id.* 95.

By letter dated May 5, 2010, to David Voluck, Ms. Miller's attorney, Mr. Knox extended the deadline to accept the reassignment to May 14, 2010. *Id.* 92. On May 12, Mr. Voluck wrote Mr. Knox asking for a further extension of time. After receiving no response, Mr. Voluck emailed Mr. Knox on May 14, declining Ms. Miller's directed reassignment. His email stated that the liaison position created a "geographic hardship" that allowed "no other viable option for Ms. Miller other than to decline the Anchorage-based position." *Initial Decision* at 3.

On May 19, 2010, Mr. Knox presented Ms. Miller with an official notice of proposed removal. J.A. 88–91. The notice outlined the reasons Mr. Knox believed Ms. Miller to be "uniquely qualified to fill the newly created position of Alaska Native Affairs Liaison." *Id.* 88. It also explained that removal was necessary because Ms. Miller's refusal to accept the position, among other things, "un-

---

agency in its dealings with all Alaska Indian Tribes. J.A. 167.

dermine[d] the agency's ability to assign and manage work and efficiently manage its workforce." *Id.* 89.

On July 26, 2010, Regional Director Susan Masica issued a decision sustaining Ms. Miller's removal for failure to accept the management-directed reassignment. *Id.* 80–87. Ms. Masica found unpersuasive Ms. Miller's preference "to remain in Sitka because of family, financial and medical reasons." *Id.* 81. She also found that "removal [was] the appropriate penalty and w[ould] promote the efficiency of the service." *Id.* 80. Ms. Miller's removal became effective August 6, 2010.

## II.

Ms. Miller timely appealed her removal to the Board. Before the Board, she contended that the agency's decision to direct her reassignment to the Alaska Native Affairs Liaison position was not bona fide because the position was created for the sole purpose of reassigning her from her superintendent position without triggering an adverse action. She also contended that she was not qualified for the position. *Initial Decision* at 13. Ms. Miller also asserted several affirmative defenses. First, she argued that Ms. Masica should not have been the deciding official because she was one of her immediate supervisors. *Id.* at 22. Second, she contended that the removal action involved discrimination based on her gender, race, and physical disability. *Id.* at 23–28. And third, she asserted that the removal was reprisal for equal employment opportunity complaints she had filed with the agency. *Id.* at 28–29.

The AJ held an evidentiary hearing on November 8–9, 2011. *See* J.A. 200, 329. Mr. Knox testified as to the agency's need for an Alaska Region liaison, the process of creating the position starting in the fall of 2009, the requirements for the new position, Ms. Miller's qualifications, and his reasons for ordering her reassignment. According to Mr. Knox, Ms. Miller "was doing great work

at Sitka." *Id.* 220 at 78:17–79:6; *see also id.* 206 at 23:15–25:21.  From his perspective, she "was the only person [he] could think of that . . . fully met all [the liaison position's] needs, and that had shown success in working through difficult issues and building relationships with . . . tribes in a demonstrable way." *Id.* 208 at 30:8–31:4.  Ms. Masica testified similarly.  She lauded Ms. Miller's work at SNHP and stated that the "reassignment was based on [the agency's] need to fill the Native liaison position, and [the agency's] belief that Ms. Miller had the strong set of qualifications and skills that were needed in that position." *Id.* 230 at 120:12–18.

For her part, Ms. Miller testified that she was not qualified for the Alaska Native Affairs Liaison position, claiming that she had no knowledge of Alaskan native law. *Initial Decision* at 13.  Ms. Miller also testified that she did not consider herself an expert in terms of being able to liaise with native tribes.  Additionally, Ms. Miller stated that she did not share Mr. Knox's view that acceptance of the reassignment would enhance her career.  In that regard, she testified that, if she accepted the reassignment, she would be moving from a decision-making position to a staff position. *Id.* at 14.  She did state, though, that she had inquired as to whether the position could be based in Sitka and at the GS-14 level. *Id.*  Ms. Miller also testified that she had informed Mr. Knox that she had family concerns, as her parents were in their seventies, and that she herself had both health and financial concerns. *Id.*

Ms. Miller also presented the testimony of Stephen Perloff, a personnel management consultant. *Id.* at 15–16.  Mr. Perloff testified regarding Ms. Miller's claim that she was not qualified for the liaison position.  He opined that the individuals involved in creating the position were committed to it grading out to GS-13, and he found it curious that the position was circulated between the agency's Regional Office and Human Resources several

times as a GS-12 position until it included duties sufficient to support a GS-13 grade. According to Mr. Perloff, Ms. Miller had neither the work experience nor the educational background necessary to meet the minimum qualifications for the liaison position. As additional support for her contention that she was not qualified for the Alaska Native Affairs Liaison position, Ms. Miller presented documentation showing that she had applied for a GS-12 liaison position with the Department of the Army in Walla Walla, Washington, and she testified that she had been rejected for the position as not being minimally qualified. *Id.* at 18.

Apparently anticipating Ms. Miller's argument as to qualifications, during its case-in-chief, the agency presented the testimony of Helen Stewart. *Id.* at 17–18. Ms. Stewart is a Supervisory Human Resource Specialist with the U.S. Fish and Wildlife Service. Ms. Stewart testified, contrary to Mr. Perloff, that Ms. Miller was qualified for the liaison position and that, if she was not qualified for the position, she would not have been qualified for her prior Park Superintendent position at SNHP. *Id.* at 17. Ms. Stewart also testified that iterative development and classification of new positions is common. She explained that managers often work with classifiers over a period of time to make adjustments to a position description in order to obtain the desired workforce results.

In deciding Ms. Miller's appeal, the AJ employed the analytical framework set forth in *Ketterer v. Department of Agriculture*, 2 M.S.P.R. 294 (1980). *See Initial Decision* at 5–6 (citing *Frey v. Dep't of Labor*, 359 F.3d 1355, 1360 (Fed. Cir. 2004)). In *Ketterer*, the Board established a two-step approach for deciding an appeal of a removal action based upon refusal to accept a reassignment. "In a removal for cause following a refusal to accept a reassignment," the Board stated, "the agency must prove by a preponderance of the evidence that the removal will promote the efficiency of the service. This necessarily

includes a demonstration that the agency's decision to reassign the employee was a bona fide determination based on legitimate management considerations in the interests of the service." *Ketterer*, 2 M.S.P.R. at 298. The Board continued: "As part of its initial burden, the agency must come forward with evidence showing a legitimate management reason for the reassignment." *Id.* at 299. The Board explained that "[t]ogether with evidence that the employee had adequate notice of the decision to transfer and that he refused to accept the reassignment, this would ordinarily be sufficient to establish a prima facie case." *Id.* The Board stated that, "[o]nce the agency makes out a prima facie case, the burden of going forward with rebuttal evidence shifts to the employee but the burden of persuasion . . . never shifts from the agency." *Id.* (quoting *Losure v. Interstate Commerce Comm'n*, 2 M.S.P.R. 195, 201–02 (1980)). Subsequently, in *Umshler v. Department of the Interior*, the Board reiterated that, once the agency establishes a prima facie case, the burden of going forward with rebuttal evidence shifts to the employee, even though the ultimate burden of proof never shifts from the agency. 44 M.S.P.R. 628, 630 (1990) (citing *Ketterer*, 2 M.S.P.R. at 298–99). And the Board elaborated:

> If the employee can demonstrate that the reassignment had no solid or substantial basis in personnel practice or principle, the Board may conclude that it was not a valid discretionary management determination, but was instead either an improper effort to pressure the appellant to retire, or was at least an arbitrary and capricious adverse action.

*Id.*

The AJ found that, through the testimony of Mr. Knox and Ms. Masica, the agency had met its initial burden of showing, by a preponderance of the evidence, that it had

legitimate management reasons for Ms. Miller's reassignment. *Initial Decision* at 6–13. The AJ also found that Ms. Miller had failed to rebut the agency's prima facie case for reassignment. *Id.* at 13–21. The AJ determined that the Alaska Native Affairs Liaison position was created based on valid agency concerns. The AJ credited Mr. Knox's testimony, finding that the position was not created merely for purposes of reassigning Ms. Miller, but had been discussed months in advance of the reassignment order as a result of an undisputed need for a liaison position in the Alaska Region. *Id.* at 20. With respect to qualifications, the AJ found that Ms. Miller "was qualified to perform the duties . . . of the new position." *Id.* at 21. At the same time, she found that Ms. Miller's testimony regarding her application for the liaison position within the Department of the Army to be "not credible" and "unpersuasive." *Id.* at 18, 19, 21. The AJ determined that it was "highly improbable" that Ms. Miller would have accepted the Department of the Army position, even if it had been offered. *Id.* at 19. Based on her factual findings and credibility determinations, the AJ sustained the agency's directed reassignment as being "bona fide." *Id.* at 21, 30. The AJ stated:

> I find that the management directed reassignment was lawful, that it was based on legitimate management considerations and that the appellant was given adequate notice of the reassignment. I also find no merit in the appellant's assertion that she is not qualified for the position. Lastly, there is no dispute that the appellant declined the management directed reassignment. The record contains her written election.

*Id.* at 19–20 (citation omitted).

Ruling on Ms. Miller's affirmative defenses, the AJ held that Ms. Miller had failed to establish any error associated with Ms. Masica serving as the deciding offi-

cial; in the AJ's view, the decision was properly made by an official superior to the proposing official, Mr. Knox. *Id.* at 23. The AJ also determined that Ms. Miller had failed to establish her several claims of discrimination. *Id.* at 23–28. The AJ rejected Ms. Miller's claim of retaliation, finding that there was no nexus between any of her equal employment opportunity complaints and the removal. *Id.* at 28–29. Finally, the AJ held that the agency's action removing Ms. Miller for failure to accept the directed reassignment was reasonable and promoted the efficiency of the service. Citing *Doe v. Department of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009), and *Brown v. Department of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000), the AJ found that Ms. Miller's refusal to accept the directed reassignment provided the necessary nexus to the efficiency of the service. *Initial Decision* at 30. As far as reasonableness of the penalty was concerned, citing *Frey*, 359 F.3d at 1357, the AJ stated: "It is well established that removal is not an unreasonably harsh penalty for refusing to accept a directed reassignment." *Id.* (relying further on *Wieser v. Dep't of the Army*, 280 F. App'x 959, 962 (Fed. Cir. 2008)). The AJ accordingly affirmed Ms. Miller's removal for declining a legitimate reassignment order.

## III.

Ms. Miller petitioned the Board for review of the AJ's decision. In her petition, she made two main arguments: (1) that the AJ erred because the agency lacked legitimate management reasons for reassigning her to the Alaska Native Affairs Liaison position; and (2) that she did not meet the minimum qualifications for the position.

On April 3, 2013, the Board issued an Opinion and Order vacating the AJ's decision and reversing Ms. Miller's removal. In its decision, the Board revisited and abandoned *Ketterer*'s two-step analytical framework for reviewing adverse actions based on refusal to accept a

directed reassignment. *Miller v. Dep't of the Interior*, No. SF-0752-11-0766-I-1 (M.S.P.B. Apr. 3, 2013) (vacated). In its place, the Board adopted a single efficiency of the service standard for analyzing together both the reassignment and the adverse action. Having done so, it ruled that Ms. Miller's reassignment and removal did not promote the efficiency of the service. Several weeks later, however, on May 13, 2013, the Board reopened the case on its own pursuant to 5 C.F.R. § 1201.118. After doing so, it vacated its April 3 opinion and issued a substitute opinion, still reversing Ms. Miller's removal. *Miller I*, 119 M.S.P.R. at 440.

In its substitute opinion, the Board again stated that it was abandoning the two-step framework of *Ketterer*. In the Board's view, "the burden-shifting apparatus outlined in *Ketterer* does not meaningfully add to the Board's adjudication of an adverse action based on a refusal to accept a directed geographic reassignment." *Id.* at 441–42. The Board stated that, in "abandoning the cumbersome and unnecessary burden-shifting approach," it was not departing "from any of the jurisprudential principles otherwise governing [the] review of an adverse action based on a refusal to accept a geographic reassignment." *Id.* at 442. The Board stated that henceforth it would "simply weigh all the evidence and make a finding on the ultimate issue of whether the agency proved . . . that the misconduct occurred and that its action promotes the efficiency of the service." *Id.*

Having rejected *Ketterer*'s burden-shifting framework, the Board ruled that the evidence did not support a finding that Ms. Miller's reassignment was due to bona fide management considerations or that her removal promoted the efficiency of the service. *Id.* at 443. It instead found that Ms. Miller submitted "credible evidence to cast doubt on the agency's motivations in effecting her removal" and that the reassignment was merely a "veil" to effect her separation. *Id.* at 444. Specifically, the

Board concluded that the agency, while having a legitimate basis for creating the Alaska Native Affairs Liaison position, failed to establish a rational basis for requiring Ms. Miller to accept the reassignment. *Id.* at 443. In reaching that conclusion, the Board pointed out that the agency had not shown that the reassignment was "necessary" due to the park superintendent position being eliminated or due to a reduction-in-force program. *Id.* Accordingly, the Board ruled that the "agency . . . failed to provide any evidence that the appellant's geographic reassignment was necessary" or any evidence that her removal was "rationally related to the efficiency of the service." *Id.* at 444. Thus, the Board reversed the agency's removal and ordered Ms. Miller's reinstatement as Park Superintendent of SNHP.[3] *Id.*

OPM petitioned the Board to reconsider *Miller I.* On December 6, 2013, the Board issued a third opinion, denying OPM's petition and affirming, with modifications, its decision in *Miller I. Miller II*, 120 M.S.P.R. at 428. In *Miller II*, the Board addressed OPM's contention that the Board was obligated to follow *Ketterer*'s two-step approach because it was adopted by this court in *Frey*, 359 F.3d 1355, as the law of the circuit. Even though we stated in *Frey* that we "endorse the Board's approach in [*Ketterer* and *Umshler*] . . . and adopt it as the law of the circuit," *id.* at 1360, the Board disagreed that it was bound by the *Ketterer* framework. *Miller II*, 120 M.S.P.R. at 434. It stated that, in its view, in *Frey*, this court had merely "endorsed" the *Ketterer* approach. *Id.* The Board viewed

---

[3]  As far as Ms. Miller's affirmative defenses were concerned, the Board stated: "[W]e discern no error in the [AJ]'s findings, which the appellant does not challenge on review, that the appellant failed to prove her affirmative defenses of discrimination, retaliation, and harmful procedural error." *Miller I*, 119 M.S.P.R. at 441 n.2.

our decision in *Frey* as premised on deference to the MSPB. *Id.* at 436. It therefore reasoned that *Frey* could not be precedential and binding because it could be modified by later panels of this court, without *en banc* review. *Id.* at 436–37 (citing *Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326, 1336–38 (Fed. Cir. 2005)).

The Board also addressed OPM's argument that it had improperly imposed a new requirement that an agency prove that a reassignment was "necessary" and not based on just a legitimate reason. The Board rejected OPM's claim that it had added a new requirement in reassignment cases. It explained that, despite its focus on whether Ms. Miller's position had been eliminated, its overall "emphasis" was on the agency's failure to show a bona fide reason for reassignment. *Id.* at 431–32. Accordingly, the Board modified *Miller I* by stating that "an agency need not prove that a geographic reassignment is 'necessary.'" *Id.* at 433. It further modified *Miller I* by stating that the agency had failed to show any "rational basis" for requiring Ms. Miller to accept the reassignment because it did not show, for example, that "the Superintendent position had been eliminated" or that there was "no need for [Ms. Miller's] continued performance." *Id.*

Finally, the Board reiterated that it had found that "the agency did not show that its reasons for the directed geographic reassignment were bona fide and that the agency instead invoked its discretion to reassign the appellant as a 'veil' to effect her separation." *Id.* at 438. The Board accordingly affirmed, as modified, its decision in *Miller I*, making it the final decision of the Board. *Id.*

As noted, pursuant to 5 U.S.C. § 7703(d), OPM petitioned us to review the Board's final decision, and we granted the petition. *Miller*, 562 F. App'x 978. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(9).

DISCUSSION

The scope of our review in an appeal from a decision of the Board is limited. We must affirm the decision of the Board unless it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1361 (Fed. Cir. 1998).

I.

OPM asks us to reverse the Board's decision reinstating Ms. Miller to her position as Park Superintendent of SNHP. It first argues that the Board committed reversible error because it effectively engaged in a review of the merits of the agency's reassignment order. It contends that agencies have, and require, broad discretion in the management of their workforces, which includes the reassignment of employees. It points out that reassignment, by itself, is not an "adverse action" subject to the Board's plenary review. It argues the Board's review is limited under our precedent in *Frey* to determining only whether the reassignment had "no solid or substantial basis in personnel practice." *Frey*, 359 F.3d at 1360.

OPM further contends that the Board's decision is contrary to the AJ's undisturbed findings of fact. It points to the AJ's finding that the agency demonstrated a legitimate need for the liaison position in the Alaska region, as well as her finding that the agency also demonstrated a need for the position to be in Anchorage. *See Initial Decision* at 20 ("The evidence . . . shows that the agency had decided to create the new position . . . for valid agency concerns" and that there was a "need for a full time Alaska Native Affairs Liaison position to be based in Anchorage."). OPM also points to the AJ's crediting of the testimony of Mr. Knox that Ms. Miller was considered the

best qualified employee in the Alaska region. *See, e.g., id.* ("Mr. Knox credibly testified that he decided to reassign [Ms. Miller] when he was working on creating the new position in the spring of 2010 and discussed her abilities for the new position with Ms. Masica because she had exhibited the very skills they wanted in the position while working as the Superintendent in Sitka."). OPM further points to the testimony of Ms. Masica that "the appellant was doing a great job of building relationships and had good ideas for solving problems and how to tackle them." *Id.* OPM therefore argues that the Board's conclusion that the agency's decision was not bona fide is inconsistent with the AJ's undisturbed findings of fact.

For her part, Ms. Miller argues that the Board correctly determined that the agency failed to meet its burden of showing a bona fide reassignment. She contends that, in reaching its decision, the Board did not exceed the scope of its authority by reviewing whether managerial discretion had been properly invoked by the agency. Ms. Miller urges that the Board properly found that she showed that her reassignment had no basis in personnel practice. While conceding that there is no direct evidence that the agency desired her separation or resignation, she nevertheless insists that the Board was within its authority to infer from the agency's actions that she was not reassigned in good faith. Significantly, on appeal, Ms. Miller does not challenge the AJ's credibility determinations, her findings of fact, or her rejection of Ms. Miller's several affirmative defenses. Neither does Ms. Miller argue any grounds for reversing the AJ's decision sustaining her removal, other than those upon which the Board relied.

The MSPB on appeal agrees with Ms. Miller that the Board reached the correct result in this case. In addition, it contends that, as a part of the Board's statutory authorization to conduct a de novo review of adverse removal actions, it may look at the merits of an agency's underly-

ing reassignment order. It urges that the Board must review the agency's action in its entirety, including the agency's management considerations in ordering a reassignment.[4]

## II.

Turning to our analysis, we first hold that the Board erred as a matter of law in abandoning the *Ketterer* two-step burden-shifting approach described above.[5] In *Frey*, we examined *Ketterer* and *Umshler*, and we set forth the burden-shifting approach that they articulate. 359 F.3d at 1360. Then, referring to *Ketterer* and *Umshler*, we stated: "We endorse the Board's approach in these cases, as set forth above, and *adopt it as the law of the circuit.*" *Id.* (emphasis added). Thus, contrary to what the Board

---

[4]  Amici, the National Federation of Federal Employees and the American Federation of Government Employees, argue in support of Ms. Miller that the Board's decision turned on a finding that the agency's reassignment decision was not based on bona fide management considerations. They contend that the reassignment was used "solely as pretext for leveraging removal" based on "personal animosity." Amici Br. at 5. They also argue that reversing the Board's decision would result in eliminating the requirement that assignments be based on bona fide management considerations.

[5]  In its Opening Brief, OPM stated: "[W]e do not challenge the board's right to abandon the 'burden-shifting' approach to considering evidence outlined in *Ketterer*." Pet'r's Opening Br. at 14. During oral argument, however, counsel for OPM retracted that statement. Specifically, OPM was asked: "You agree that the Board was wrong here to jettison the burden-shifting approach?" Counsel answered in the affirmative, stating: "Yes. I believe *Frey* actually controls." Oral Arg. at 3:40–3:52; *see also id.* at 4:30–4:49.

said in *Miller II*, we did not merely "endorse" the *Ketterer* framework. Rather, in clear and certain terms, we made it the "law of the circuit." *Ketterer*'s approach thereby became law that must be followed by the Board and panels of this court until overruled by either the Supreme Court or by this court *en banc*. *E.g.*, *Tex. Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) ("This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling authority such as intervening statutory change or Supreme Court decision."); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1373 (Fed. Cir. 2001) (citing *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993)) (stating that "*stare decisis* is a doctrine that binds courts to follow their own earlier decisions or the decisions of a superior tribunal"); *see also Soc. Sec. Admin. v. Mills*, 73 M.S.P.R. 463, 470 (1996) (decisional law "adopted" by the Federal Circuit is "binding on the Board"), *aff'd*, 124 F.3d 228 (Fed. Cir. 1997) (table). The Board here was not empowered to reject controlling law. In short, *Ketterer* was, and continues to be, the law of the circuit. It therefore must be followed.

## III.

With *Ketterer* the proper starting point, our task is straightforward: to determine whether substantial evidence supports the AJ's holdings (1) that the agency established, by a preponderance of the evidence, that it had legitimate management reasons for Ms. Miller's reassignment; and (2) that Ms. Miller failed to rebut the agency's prima facie case.

As discussed, the AJ found that the agency, through the testimony of Mr. Knox and Ms. Masica, had met its initial burden of showing, by a preponderance of the evidence, that it had legitimate management reasons for Ms. Miller's reassignment. The AJ credited Mr. Knox's testimony that the decision to create the liaison position

was made in the fall of 2009 based on a recognized need for the position. *Initial Decision* at 6, 20. In addition, the AJ found that Anchorage was "credibly" identified as the duty station for the position. *Id.* Further, the AJ accepted the testimony of Mr. Knox and Ms. Masica that the liaison position was not created to effect Ms. Miller's reassignment. *Id.* at 8, 9–10, 20. With respect to Ms. Miller's qualifications, the AJ credited the testimony of Mr. Knox and Ms. Masica. As seen, they testified that, as Ms. Miller's supervisors, they believed she had the unique strengths to fill the Alaska Native Affairs Liaison position. The AJ, in fact, found it noteworthy that Ms. Miller told Mr. Knox she would consider the position if it was graded higher, at a GS-14 level. *Id.* at 10. Thus, the AJ found that the agency had acted to reassign Ms. Miller based on legitimate management considerations. *Id.* at 12, 20. Substantial evidence supports that finding.

The AJ further determined that Ms. Miller did not rebut the agency's prima facie case for reassignment. The AJ explained in detail that Ms. Miller's conflicting testimony "put the appellant's credibility in question." *Id.* at 19. She found "unpersuasive" Ms. Miller's testimony about applying for the Department of the Army liaison position in Washington State and found "no merit in the appellant's assertion that she is not qualified for the [Alaska Native Affairs Liaison] position." *Id.* at 20; *see also id.* at 17–18 (explaining that Supervisory Human Resource Specialist, Helen Stewart, testified that Ms. Miller was qualified for the liaison position). While the AJ was sympathetic to Ms. Miller's reservations about leaving Sitka for Anchorage, she found that no evidence presented by Ms. Miller undermined the agency's basis for reassignment, especially in view of the agency's broad discretion to reassign employees. *Id.* at 21; *see also Gava v. United States*, 699 F.2d 1367, 1370 (Fed. Cir. 1983) ("[T]he government has broad discretion to reassign its employees to different locations, and to discharge them for

COBERT v. MILLER 19

refusal to accept a new assignment."). The AJ thus found that Ms. Miller did not rebut the agency's legitimate management decision. Substantial evidence supports that finding.

The Board's statement that "the agency failed to present any evidence showing that its reasons for directing [Ms. Miller's] reassignment to Anchorage were bona fide such as to support a finding that her removal for refusing to take the reassignment promoted the efficiency of the service," *Miller I*, 119 M.S.P.R. at 443–444, is not supported by the record and is contrary to the AJ's unchallenged findings of fact discussed above.

Contrary to the Board's reasoning, the fact that the agency lost a skilled employee in Ms. Miller and had two position vacancies after her removal does not demonstrate that the efficiency of the service was not served by her removal, or suggest an improper effort to force her separation. *See Miller II*, 120 M.S.P.R. at 437; *Miller I*, 119 M.S.P.R. at 444. It is the case in every legitimate removal of an employee for failure to accept a directed reassignment that the agency will be confronted with the loss of an employee with expertise that the agency considered valuable and that the agency will have two vacancies to fill. Quite simply, no evidence cited by the Board supports either its conclusion that credible evidence "cast doubt on the agency's motivations" or its conclusion that Ms. Miller's reassignment was a "veil" to effect her removal. Indeed, the AJ's undisturbed and unchallenged findings of facts are squarely to the contrary.

Ms. Miller and the MSPB argue that the Board's ultimate decisions in *Ketterer* and *Umshler* support affirmance in this case. We disagree. In both *Ketterer* and *Umshler*, the Board set aside removal actions that followed an employee's refusal to accept a reassignment. This case is unlike *Ketterer* and *Umshler*, however. In *Ketterer*, credible evidence was presented that the basis

for the appellant's reassignment was mistaken, that his removal was based on an effort to promote another employee, and that the reassignment location was used "as a place to send employees in order to encourage them to leave the agency by retirement or resignation." 2 M.S.P.R. at 299–300. Accordingly, the Board ordered the agency to cancel the appellant's reassignment and removal. In *Umshler*, the Board found that the agency had established a prima facie case supporting the validity of the appellant's reassignment. 44 M.S.P.R. at 630–31. It also found, however, that the AJ had erred by improperly limiting the appellant's attempt to rebut that case by casting doubt upon the existence of a legitimate management reason for his reassignment. *Id.* at 631–32 ("[T]he administrative judge erred by denying both of the witnesses the appellant requested to establish that the agency engaged in a pattern and practice of using directed reassignments for improper purposes."). The Board therefore remanded the case for further proceedings. In short, the ultimate decisions in *Ketterer* and *Umshler* are inapposite here.

Finally, it is beyond dispute that "[f]ailure to follow instructions or abide by requirements affects the agency's ability to carry out its mission." *Blevins v. Dep't of the Army*, 26 M.S.P.R. 101, 104 (1985), *aff'd*, 790 F.2d 95 (Fed. Cir. 1986) (table). Ms. Miller's refusal to accept reassignment thus bore directly on the efficiency of the service. In addition, "[t]o say that an agency must select a penalty other than removal when an employee unjustifiably refuses a reassignment is in effect to say that the agency cannot insist on compliance with a lawful reassignment order." *Wieser*, 280 F. App'x at 962; *see also Frey*, 359 F.3d at 1360 ("Our predecessor court consistently upheld the discretion of an agency to terminate an employee who refused a geographical reassignment."). It was not improper for the agency to remove Ms. Miller after she refused to accept reassignment.

CONCLUSION

In her *Initial Decision*, the AJ properly utilized the *Ketterer* two-step, burden-shifting framework adopted by this court in *Frey* as law of the circuit. The AJ determined—based on credibility determinations and findings of fact undisturbed by the Board and unchallenged on appeal—that the agency had made out a prima facie case that the decision to reassign Ms. Miller was supported by legitimate management reasons and that Ms. Miller had failed to rebut that prima facie case. We, accordingly, reverse the decision of the Board vacating the *Initial Decision* and reversing Ms. Miller's removal. The case is remanded to the Board, which is instructed to instate the *Initial Decision* as the final decision of the Board.

**REVERSED and REMANDED**

COSTS

Each party shall bear its own costs.

# United States Court of Appeals
# for the Federal Circuit

---

**BETH F. COBERT, ACTING DIRECTOR, OFFICE
OF PERSONNEL MANAGEMENT,**

*Petitioner*

**v.**

**MARY A. MILLER, MERIT SYSTEMS PROTECTION
BOARD,**

*Respondents*

---

2014-3101

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-11-0766-R-2.

---

WALLACH, *Circuit Judge*, concurring.

The Board improperly ignored *Ketterer*. Therefore, I concur with the Panel's judgment to reverse the Board's decision and remand this case to the Board to instate the *Initial Decision* as its final decision. However, I write separately because I believe that the agency's bad faith taints the AJ's factual findings.

In *Miller I*, the Board stated "the agency failed to present any evidence showing that its reasons for directing [Ms. Miller's] geographic reassignment to Anchorage were bona fide such as to support a finding that her removal for refusing to take the reassignment promoted the efficiency of the service." *Miller I*, 119 M.S.P.R. at 443–44. The

Majority holds the statement was not supported by the record and was contrary to the AJ's uncontested factual findings.

I disagree with the Majority. The AJ made factual findings within the *Initial Decision* after assessing evidence presented by the parties and weighing the credibility of the witnesses' testimonies. These factual findings and credibility determinations remain uncontested on appeal, and we are bound by the failure to challenge them. However, it appears obvious to me that the agency's actions were entirely pretextual and in bad faith.

The AJ credited the testimony of Mr. Knox, Ms. Masica, and Ms. Stewart when making her findings. Mr. Knox, Ms. Miller's supervisor, testified that he was "familiar with [Ms. Miller's] background because he participated in her selection for the position of Superintendent for the [Park], called her references and supervised her for over two years." *Initial Decision* at 9. Mr. Knox stated, "he made the decision to fill the [Alaska Native Affairs Liaison] position several weeks prior to making the offer to [Ms. Miller]." *Id.* at 8. Further, Mr. Knox noted that Ms. Miller "was modeling exactly what they wanted to accomplish" in the position. *Id.*

Ms. Masica, the Regional Director for the agency in Alaska and the deciding official, stated that she requested the position be created. When filling the position, Ms. Masica testified, "she looked at a pool of candidates among the staff and [Ms. Miller] was the best for the position *based on Mr. Knox's assessment* that she had the strongest skills[,] so *the focus was on her to fill the new position*." *Id.* at 11 (emphases added).

Additionally, Ms. Stewart, a Supervisory Human Resource Specialist with the U.S. Fish and Wildlife Service, testified as a rebuttal witness to Ms. Miller's personnel management consultant. Ms. Stewart testified, "it is a manager/supervisor who decides there is a need in the

organization and gives a general description of the duties for the position to help the classifier develop the position description." *Id.* at 18. Ms. Stewart further explained that "[t]he classifier captures what is required for the position and *works with the manager or supervisor to make adjustments for the position to obtain the desired result*." *Id.* (emphasis added). Ms. Stewart "considered [Ms. Miller] qualified for the position and if [Ms. Miller] was not qualified for the Alaska Native Liaison position she does not see how [Ms. Miller] would have been qualified for the Superintendent position she held the previous two years." *Id.* at 17.

The AJ's credibility determinations for these testimonies are uncontested on appeal. In fact, however, the evidence demonstrates the dishonest manner in which Ms. Miller was selected for the Alaska Native Liaison position. Mr. Knox was familiar with Ms. Miller's background and her current capabilities. Mr. Knox directed Ms. Masica to focus on Ms. Miller when making her selection for the position. The description duties were adjusted to obtain the desired result. It is obvious to me that the agency modified the standards and qualifications to make Ms. Miller the only person uniquely qualified, within the pool of employees that were considered for the position; that the agency's actions were entirely pretextual; and that they were intended solely to present Ms. Miller with an improperly motivated Hobson's choice. Such conduct by an agency of the United States is reprehensible.